**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**


| | |
|---|---|
| WICHITA FIREMEN'S RELIEF ASSOCIATION, | ) ) ) |
| Plaintiff, | ) ) |
| v. | )     Case No. 11-1029-KGG ) |
| KANSAS CITY LIFE INSURANCE COMPANY, | ) ) ) |
| Defendant. | ) |
| _____ | ) |

## <u>MEMORANDUM & ORDER</u>

Before the Court are the various dispositive motions filed by the parties,

along with corresponding exhibits, responses and replies:

a.    Plaintiff's "Motion for Protective Order and a Determination as a Matter of Law . . . that Plaintiff is Entitled to a *de novo* Review of Defendant's Decision to Deny Coverage" and memorandum in support (Docs. 204, 214);

b.    Defendant's Motion for Summary Judgment and memorandum in support (Docs. 341, 349); and

c.    Plaintiff's Motion for Summary Judgment and memorandum in support (Doc. 342, 347).

Plaintiff's claim is for payment of an Accidental Death and Dismemberment insurance benefit arising out of the death of a Wichita firefighter which occurred as a result of a heart attack suffered while fighting a fire. Because the undisputed material facts establish that the decedent's death did not "result directly and independently of all other causes from accidental bodily injuries" within the meaning of the policy coverage provision, there is no coverage for the claimed loss under the insurance policy.

Additionally, the Court finds that the existence of the attachment of a Statement of ERISA Rights to the policy (a policy which is exempt from ERISA by law) has no substantive impact on the determination of the central legal issue in this case. The Court further finds that Defendant included this ground for denial in both the initial claim denial and the appeal denial, and that Defendant would be allowed to rely on this reason for denial before this Court even if it had not done so. As such, the Court **GRANTS** Defendant's Motion for Summary Judgment.[1] (Doc. 341.) Plaintiff's "Motion for Protective Order and a Determination as a Matter of Law . . . that Plaintiff is Entitled to a *de novo* Review of Defendant's

---

[1] Also pending are Plaintiff's "First Motion for an Addition to the Administrative Record" (Doc. 216), Defendant's "Motion in Limine to Exclude Evidence Relating to Settlement Negotiations" (Doc. 318), and Plaintiff's "Motion to Exclude Dr. Arnold Meshkov's Testimony and Report from Evidence" (Doc. 368). Because the Court is granting summary judgment herein, these motions are all **DENIED** as moot.

Decision to Deny Coverage" (Doc. 204) and Motion for Summary Judgment (342) are both **DENIED**.

## BACKGROUND

This is a breach of contract claim relating to insurance coverage for Captain Urban Eck ("Decedent"), a fire fighter for the City of Wichita, Kansas. Plaintiff contends that Defendant breached its duties under the policy of insurance it issued for the Decedent. Plaintiff contends that Decedent's death should be considered "accidental" under the policy at issue. Plaintiff contends that Defendant voluntarily made the Employee Retirement Income Security Act ("ERISA") part of the applicable policy and failed to provide certain rights required by ERISA, including the right to a "full and fair" appeal. Plaintiff further contends that improperly Defendant added "lack of an accident" as new reason for denial of coverage after the litigation commenced. Defendant argues that ERISA does not apply to the insurance policy, that Plaintiff's death was not accidental within the meaning of the policy, and that it maintained this position throughout the insurance claim and appeal process.

## I.    UNDISPUTED FACTS.

The following facts are material and undisputed for purposes of the above-referenced motions.

### A.    Decedent's Employment and Training.

Decedent was a firefighter employed by the City of Wichita Fire Department ("WFD"). He was hired as a firefighter in 1982, was promoted to Lieutenant in 1989, and promoted to Captain in 1994. It is uncontroverted that Decedent was an experienced firefighter who received as much training as other firefighters in the Wichita Fire Department.

WFD firefighters are required to master basic fire suppression skills, including climbing ladders, operating equipment, and employing protective equipment. WFD firefighters must have the ability to operate in conditions that are immediately dangerous to life and health, such as may arise during a structure fire. This is covered with WFD firefighters during their training. WFD firefighters are also aware of the physically and emotionally stressful nature of their work.

**B.     The Parties Enter into an Insurance Contract.**

Plaintiff is the Wichita Firemen's Relief Association ("WFRA" or "Plaintiff"), which is "composed of the regularly appointed members of the Wichita Fire Department" in Wichita, Kansas. (Doc. 347-20, sealed, at 3.) Plaintiff is organized pursuant to the Firefighters Relief Act, K.S.A. § 40-1701, *et seq*. The purpose of Plaintiff is "to receive, use and disburse funds for the benefit of members of the Association or their beneficiaries." (*Id*.) Defendant Kansas City Life Insurance Company ("KCL" or "Defendant") is an insurance corporation

"organized and existing pursuant to the laws of the state of Missouri " and registered to conduct business in Kansas. (Doc. 75, at 1.)

The parties entered into a group policy insurance contract on September 1, 2001, policy number GL-7389. Plaintiff WFRA was the named beneficiary under the policy. Effective April 1, 2007, the parties reached an agreement to add accidental death and dismemberment insurance ("AD&D Rider"). Under the terms, conditions, and exclusions of this policy, Decedent Urban Eck was insured against death, disability, and death by accidental means. The AD&D coverage was in effect on the date of Decedent's death, January 2, 2010. Plaintiff paid the premiums to Defendant for the policy.

The "Benefit" section of the AD&D Rider stated, in relevant part, that the benefit would be paid upon receipt of satisfactory proof that the loss "results directly and independently of all other causes from accidental bodily injuries," the "accident which caused the loss" occurred while the individual was insured under the rider, and the loss occurred within 180 days "after the accident." (Doc. 215-11, at 11-12.) The "Exclusions" of the AD&D Rider stated in part that "No amount will be payable for loss caused by, contributed to or resulting from . . . (5) bodily or mental illness or disease of any kind, or medical or surgical treatment of the illness or disease[.]" (*Id.*, at 12.) Neither the policy nor the AD&D Rider include

definitions of "bodily injury," "accident," "accidental death," "illness," "accidental bodily injuries" or "disease."

## C.  "Statement of ERISA Rights."

The parties have differing interpretations as to whether or not the insurance policy in controversy was issued with an attachment consisting of the "Statement of ERISA Rights"/"Claim Procedures for Life Insurance Plans" attachment (hereinafter referred to as "Statement of ERISA Rights").  (215-13.)

Matthew O'Connor, Defendant's Assistant General Counsel for Investments, testified that he "assumed" the Statement of ERISA Rights was made part of the WFRA group insurance benefits policy.   Jeffrey Seeman, Defendant's Vice President of Group Insurance, testified that he "believed" the standard form policy would include a Statement of ERISA rights because "most" – but not all – group insurance policies are provided by an employer and are covered by ERISA.  Also, Mr. Seeman and Cynthia Anderson, Defendant's Assistant Vice President of Group Underwriting, attested that "[a]t the time of the issuance" of the policy at issue, "KCL's normal and customary business practice was to attach the 'Statement of ERISA Rights' to all insurance policies when issued, regardless of whether ERISA is applicable to that specific policy."  (Doc. 347-27, at 3; Doc. 347-28, at 3.)

Plaintiff was not aware of the "Statement of ERISA Rights" pages until after the litigation had commenced.  (Doc. 364-9, at 13.)  Further, at no time between

2001 and 2009 did members of Plaintiff's Board believe that any of the Association's members were entitled to ERISA rights or protections. (Doc. 364, at pg. 88, ¶ 91; Doc. 364-9, at 29.) Plaintiff has no evidence that it ever even received the "Statement of ERISA Rights" during the relevant time period. (Doc. 364, at 89-90; Doc. 364-9, at 52-53.) For the purpose of this ruling, however, the Court will assume that when the policy was delivered to the plaintiff it included the two final pages, which the parties identify as associated with ERISA rights.

**D.     Decedent fights a fire as part of his job duties**.

On December 13, 2009, Decedent and approximately 70 other city firefighters fought a two-alarm fire at Cedar Lakes Condominiums in Wichita, Kansas. The building was a total fire loss. Decedent fought this fire for approximately one hour of uninterrupted work under extreme conditions. Although Decedent did not engage in firefighting under such conditions on a daily basis as part of his job, the working conditions at the fire at issue were consistent with Decedent's training as well as an expected part of his job duties. Decedent was not subjected to an unexpected manifestation of force at the subject fire. He did not fall, did not have a portion of the structure collapse on him or under him, and did not get hit by a portion of the structure.

Decedent and two of his crew did, however, report to rehab for medical treatment following the fire. Acting WFD Lieutenant Paul Wiebe was one of the

officers working rehab during the subject fire. Wiebe observed that Decedent "had an irregular heartbeat and his vitals would not come down to normal limits." MICT Michael Turner also worked rehab during the subject fire. Turner indicated that Decedent was held in rehab as a result of an elevated heart rate that did not exhibit normal recovery. Decedent's heart rate did recover to the threshold limit. Forty-five WFD firefighters were evaluated after the fire and three required advanced assistance. All four members of Decedent's crew were held in rehab for at least 20 minutes. Decedent remained in rehab for approximately 45 minutes.

### E. Plaintiff's Post-Fire Medical Treatment.

Progress notes regarding Decedent from cardiologist Dr. Wassim Shaheen dated December 18, 2009, state that Decedent "today reports that the symptoms started many years ago, however, since Sunday while working he noticed that his heart has been racing faster than it usually does. The patient describes it as fast beats." Dr. Shaheen performed a transesophageal echocardiogram which showed enlargement of Decedent's left atrium and significant thickening of the posterior leaflet of the mitral valve, which usually reflects myxomatous changes. The echocardiogram indicated that Decedent had mitral valve prolapse with mitral insufficiency. Decedent was diagnosed with severe mitral insufficiency secondary to posterior leaflet mitral valve prolapse on December 19, 2009.

On Dec. 21, 2009, Dr. Shaheen performed a heart catheterization on Decedent, determining that his coronary arteries did not have any blockage, but the mitral valve needed repair.  Surgery for the mitral valve repair occurred on December 29, 2009, following Decedent's admission to the hospital on December 28, 2009.  During the surgery, mitral valve inspection indicated a myxomatous valve with a largely detached posterior leaflet.  In addition, at least 3 chordal structures were disrupted.  The surgeons were satisfied that Decedent's repair was adequate, but when they tried to take Captain Eck off of the bypass machine, cardiac function was poor and the surgeons indicated that they struggled.  Decedent died on January 2, 2010, following his surgery.

The parties have advanced conflicting expert opinions regarding the cause of Decedent's death.  Plaintiff contends it was the result of an acute rupture of the chordae tendineae caused by extreme physical exertion while fighting the fire.  Defendant contends that Decedent suffered from chronic mitral valve disease that worsened for several years and that "physical exertion was not the cause of his severe chronic mitral regurgitation that led to chordal disruption and a partially flail leaflet of the mitral valve."  Defendant further contends that Decedent "had a massive acute myocardial infarct (or heart attack) caused by kinking and obstruction of the decedent's circumflex coronary artery resulting from the mitral valve annulus placement during mitral valve surgery."  (Doc. 349, sealed, at 23.)

For the purpose of this ruling, the Court assumes that plaintiff's view of the medical issues would prevail, and that Decedent's death was the result of an acute rupture of the chordae tendineae caused by extreme physical exertion while fighting the fire.

**F.    Plaintiff Files a Claim for AD&D Benefits and Appeals Defendant's Denial Thereof.**

After Decedent's death, Plaintiff filed claims for death benefits and AD&D benefits under the policy.  On February 17, 2010, Defendant paid the death benefit claim directly to Plaintiff.

On February 26, 2010, Defendant denied the claim for AD&D benefits relating to Decedent.  Accidental injury is the primary coverage predicate of the policy at issue.  The denial letter, from Senior Claims Examiner Kelly Wenninghoff, stated that Decedent's "death was not caused directly and independently of all causes from accidental injury as the insured's underlying heart condition, as well as circumstances surrounding the surgery, contributed to his death and therefore, the applicable exclusions of the policy apply."[2]  (Doc. 347-17, sealed, at 2.)  The letter continues that "benefits are payable if the loss results directly and independently of all other causes from accidental bodily injuries."  (*Id.*)  The letter then includes reference to exclusion (5), "bodily or mental illness

_____

[2]  There is some claim by Defendant that medical negligence caused or contributed to Decedent's death.  Such a claim is not, however, supported by adequate evidence in the present motions.

or disease of any kind or medical or surgical treatment of the illness or disease."

(*Id*.)

On April 26, 2010, Plaintiff appealed Defendant's denial of benefits under the AD&D Rider. On June 10, 2010, the appeal was denied on the same grounds as the initial request – that the benefit was precluded by policy exclusions which applied to pre-existing medical conditions and medical negligence – while again referencing exclusion (5). (Doc. 347-17, sealed, at 3-4.) The written denial of Plaintiff's appeal also states that Decedent's "death did not result directly and independently from accidental bodily injury." (*Id*., at 3.)

## II.    ISSUES.

1.    Was the injury at issue "accidental" under the terms of the relevant insurance policy and will Defendant be allowed to rely on this reason for denial of coverage under the AD&D rider?
2.    Is Defendant precluded from arguing, and the Court from considering, the failure of the primary coverage condition of the policy because of the wording of the claims denial letters?

## III.    DISCUSSION.

### A.    Standards on Motions for Summary Judgment.

The rules applicable to summary judgment are well-established and are only briefly outlined here. Federal Rule of Civil Procedure 56(c) directs the entry of summary judgment in favor of a party who "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). An issue is "genuine" if sufficient evidence

exists "so that a rational trier of fact could resolve the issue either way" and "[a]n issue is 'material' if under the substantive law it is essential to the proper disposition of the claim." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998). When presented with a motion for summary judgment, the Court must decide "whether there is the need for a trial – whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). If so, the Court cannot grant summary judgment. *Prenalta Corp. v. Colo. Interstate Gas Co*., 944 F.2d 677, 684 (10th Cir. 1991).

Although the parties have filed cross-motions for summary judgment, the legal standard does not change. *See United Wats, Inc. v. Cincinnati Ins. Co.*, 971 F. Supp. 1375, 1382 (D. Kan. 1997). The Court's sole objective to determine whether any disputes of material fact exist. *See Harrison W. Corp. v. Gulf Oil Co.*, 662 F.2d 690, 692 (10th Cir. 1981).

**B. Plaintiff Cannot Establish an "Accident" or "Accidental Bodily Injury" Pursuant to the Terms of the Insurance Contract.**

Benefits under the AD&D Rider of the insurance policy at issue required a loss resulting directly and independently from an "accident" and "accidental bodily injuries." The contract states, in relevant part:

The Company will pay the benefit shown below to you, if living, or your beneficiary. The benefit will be paid when satisfactory proof is received at the Home Office that:

    (1)    the loss described below results directly and independently of all other causes from accidental bodily injuries;

    (2)    the accident which caused the loss occurred while the individual was insured and

    (3)    the loss occurred within 180 days after the accident.

(Doc. 215-11, sealed, at 11-12.)

While "the word accident does not have a settled legal" definition, it does have a "generally accepted meaning, which is the same whether considered according to the popular understanding or the approved usage of language." *Gilliland v. Cement Co*., 104 Kan. 771, 773 180 P. 793, 794 (1919). "'An accident is simply an undesigned, sudden, and unexpected event, usually of an afflictive character, and often accompanied by a manifestation of force.'" *Whitaker v. State Farm Mut. Auto. Ins*., 13 Kan.App.2d 279, 282, 768 P.2d 320, 323 (1989)(*quoting Gilliland*, 180 P. at 794). *See also* Pattern Instructions Kansas 4th ¶ 124.41 (2008) ("PIK")(setting forth the same definition of the word "accident").

It is well established that in a claim under a policy for accidental death, the plaintiff has the burden of proof to establish that "the death resulted from injury due to an accident . . . ." *Miller v. Prudential Ins. Co. of America*, 183 Kan. 667,

670, 331 P.2d 310, 312 (Kan. 1958). The Court finds that Plaintiff is unable to do so in the case at bar.

Defendant contends that Decedent "was merely performing his normal duties as a firefighter when he confronted a structure fire and allegedly sustained an injury to his heart." (Doc. 349, at 53.) Defendant continues that Decedent "drew on his training and performed the normal duties of a firefighter when he responded to the December 13, 2009 structure fire at which he was allegedly injured." (Doc. 349, at 54.) Defendant further contends that Decedent "did not do anything out of the ordinary at the fire, and did not experience an event such as getting hit by a falling beam, slipping and falling, or having the floor collapse beneath him." (Doc. 349, at 55; Doc. 349-7, sealed, at 37; Doc. 350-2, at 9.)

Plaintiff responds by arguing that the activity Decedent engaged in at the scene of the fire was "out of the ordinary" because he "had nearly one hour of uninterrupted heavy or 'extreme' exertion [WFRA's Fact No. 14 at Dkt. 347; Additional Facts, infra, ¶ 214], under hazardous conditions. [WFRA's Fact No. 10 at Dkt. 347; Additional Facts, infra, ¶ 210]." (Doc. 369, sealed, at 24.) Plaintiff continues by arguing that, although Decedent was trained and employed as a fireman, fighting fires should not be considered part of his typical job duties.

> Fire calls make up only approximately 3.84% of the Wichita Fire Department calls. [Ex. MM, attached (WFD 2009 Annual Report & Statistics) at WFD 2; Ex. OO, attached (Firefighter Affidavits)]. Captain Eck did

not ordinarily or normally spend his work day in hazardous conditions trying to breathe in heavy smoke in a full turnout of gear on a nine foot ladder using a chain saw to cut a hole in a building with the heat of a two alarm fire blazing around him. These conditions under which he was exerting himself were external stressors on his body. Ordinarily, 70 firefighters are not called out all at once to do 'normal' or 'ordinary' job tasks at the Wichita Fire Department. KCL has no evidence that Captain Eck's normal or ordinary day involved the same hazardous activities, external stressors, or level of exertion he undertook while fighting the Cedar Lakes fire. And, Captain Eck's crew was working under much more stress than the other forty-two firefighters evaluated at the Cedar Lakes fire; all four members of his crew were held in rehab over 20 minutes; no other crews had this statistic. [WFRA's Facts Nos. 14, 15, 16, at Dkt. 347; Additional Facts, infra, ¶¶ 214, 215, 216].

(Doc. 369, sealed, at 24-25.)[3]

While the Court acknowledges that Decedent, like other Wichita firemen,

did not spend the majority of his work time fighting fires, the Court is unpersuaded

_____

[3] Plaintiff now argues for the first time that events occurring during the surgery preceding Decedent's death constitute an "accident," providing a basis for coverage under the policy at in question. (Doc. 347, sealed, at 58.) Plaintiff has provided no evidence to establish medical malpractice. Further, there is no evidence or authority that an unsuccessful surgery or complications occurring during the course of surgery constitute an "accident" under the terms of the insurance policy at issue. Also, given the Court's analysis herein, the Court is inclined to hold that the surgery would constitute "medical or surgical treatment of the illness or disease," which is the specific exclusion on which Defendant consistently relied throughout the underlying claims and appeal process. (*See* Section I. F., *supra*.) Finally, the Court agrees with Defendant's argument that Plaintiff failed to include this contention in the Pretrial Order and, therefore, may not do so now. The Tenth Circuit has held that "claims, issues, defenses, or theories of damages not included in the pretrial order are waived even if they appeared in the complaint . . . ." ***Wilson v. Muckala***, 303 F.3d 1207, 1215 (10th Cir. 2002).

by Plaintiff's argument. The uncontroverted fact remains that Decedent was trained and employed *as a fireman*. Fighting fires, when they occur, is undoubtedly a vital and expected part of his job duties.

Citing P.I.K. Civil 4th § 124.41, Plaintiff argues that "bodily injury" means an "injury sustained to the person through external and accidental means, as opposed to disease." (Doc. 369, at 152.) Plaintiff contends that, under Kansas law, when an accidental injury activates or aggravates a dormant disease or physical infirmity, the accident is the cause of the loss under a policy covering accidents. (*Id*.) While the Court agrees with Plaintiff in regard to these definitions, it does not agree that there is any evidence of an "accidental means" or "accidental injury" that resulted in the loss at issue.

Plaintiff does not controvert Defendant's stated fact that at the scene of the fire, Decedent did not get hit by a falling beam, did not slip and fall, and did not have the floor collapse beneath him. (Doc. 369, sealed, at 25). Plaintiff does, however, argue that this fact is "not relevant and not material" because the insurance policy "does not say that it covers accidental bodily injury only if the insured is hit by a beam, fell, was cut, or collapses through the floor." (*Id*., at 25-26.) When taken literally, Plaintiff's argument is correct – there is no requirement in the policy that Decedent fall or be cut. The policy does, however, require that "the loss described" must result "directly and independently of all other causes

16

from accidental bodily injuries."  (Doc. 2013-13, sealed, at 11-12.)  The Court

cannot agree that Decedent exerting himself at his job, even in "extreme"

conditions, equates to "an undesigned, sudden, and unexpected event, usually of an

afflictive character, and often accompanied by a manifestation of force.'"

***Whitaker***, 768 P.2d at 323 (*quoting **Gilliland***, 180 P. at 794).

In ***Miller***, *supra*, the decedent's wife sued the insurer, alleging that his death

from heart attack or heart failure was caused by "the vigorous and violent work

performed by him in his employment."  331 P.2d, at 311.  The Kansas Supreme

Court held there was no coverage under the accidental death policy:

> In this case, as far as the evidence discloses, the deceased
> was an experienced oil field 'roughneck' and was
> performing the usual and ordinary work as such.  There
> was no evidence of any slip, mishap, extraneous force,
> unusual occurrence or unforeseen development which
> took place at any time in the performance of the work.
> The handling of the tongs, pipe and cement was
> performed as usual and intended.  We cannot say the
> death of decedent, even though unforeseen and
> unexpected, resulted directly and independently from
> injuries sustained through accidental means as defined in
> the insurance policy.

*Id*., at 312.  The ***Miller*** court also stated that

> [w]e are of the opinion that if work is being carried on
> voluntarily and intentionally in the usual way, death
> which follows a heart attack or heart failure, and which
> may be assumed to be unexpected, cannot be regarded as
> produced by accidental means within the meaning of an
> insurance policy providing for accidental death benefits,
> unless there is proof of some unusual happening

preceding the heart attack or heart failure which may have caused death. Stated in another manner, if a result is such as follows from ordinary means, voluntarily employed, in a not unusual or unexpected way, it cannot be called a result effected by accidental means, but if in the act which precedes the result something unforeseen or unusual occurs which produces it, then it has been produced through accidental means.

*Id.*

Plaintiff counters that it has established

that the rupture of the tendons supporting [Decedent] Eck's heart valve was an undesigned, sudden, and unexpected event that occurred during a period of extreme exertion while fighting the Cedar Lakes fire. WFRA also proved that intense heat, weight from his full load of equipment and tools, heavy smoke, stress, physical strain, and increased pressure on his heart valve were the forces that caused the rupture. All of these forces are external to his heart, and all but the increased blood pressure are external to his body. The force from high blood pressure in this case was secondary to the hazardous external conditions at the fire; we know he did not have native atherosclerotic heart disease or high blood pressure before the fire. His blood pressure was documented as normal before the fire, and his heart catheterization after the rupture proved that he had no atherosclerosis. [Additional Facts ¶ 426]. His firefighter's physical in August, 2008 is uncontroverted and conclusive evidence of his cardiac health at that time. [Additional Facts ¶¶ 204, 205, 206, 207].

(Doc. 369, at 153.) Even assuming, for the sake of these dispositive motions, that

all of Plaintiff's contentions regarding Decedent's health are true, it fails to

establish in any way that Decedent's death was caused by an "accidental means."

18

To apply Plaintiff's reasoning to the present case, the Court would have to find that it was "unexpected" or "unforseen" that the Decedent, who was trained and employed as a fireman, would be called upon to help fight a fire, even under "extreme" conditions. In other words, that there was an "accidental means" by which Decedent was fighting a fire. The Court cannot reach such a conclusion. Even assuming the fire was started accidentally, Plaintiff's participation in fighting the fire was not accidental. Simply stated, there was no "accident" as that term is defined by the relevant case law. Further, given the nature of Plaintiff's employment, extreme work conditions cannot be unexpected.

Relying on ***Kellogg v. Metro. Life Ins. Co.***, 549 F.3d 818, 829-30 (10th Cir. 2008) Plaintiff argues "[t]here are many other cases adhering to the theory that if the accident sets into motion a series of events which culminate in death, there is coverage even when the accident must be the 'sole' cause of death." (Doc. 347, sealed, at 47.) Plaintiff's reliance on this case is misplaced, however, because the decedent in ***Kellogg*** died from injuries sustained in an automobile crash that occurred as he suffered a seizure. The ***Kellogg*** court held that the resulting "car crash – not the seizure – caused the loss at issue, i.e. [the decedent's] death, and therefore the exclusionary clause of [AD&D] policy does not apply." 549 F.3d, at 829. Thus, in ***Kellogg***, the automobile accident, by its very definition an "accident," caused the loss. In the case at bar, Plaintiff's underlying medical

condition did not cause the fire he was called upon to fight as part of his job just as his underlying medical condition did not cause the extreme conditions under which he worked.

Plaintiff's reliance on ***Boring v. Haynes***, 209 Kan. 413, 496 P.2d 1385 (1972) is equally misguided. The ***Boring*** court held that "[w]here an accidental injury activates or aggravates a dormant disease or physical infirmity, the accident may be said to have been the proximate cause of the resulting disability or death within the usual provisions and ordinary meaning of a policy insuring against accident." *Id*., at Syl. ¶ 2. The decedent in ***Boring*** was involved in an automobile collision that resulted in a heart attack, which caused the decedent's death. The Court fails to see a parallel between the automobile accident in ***Boring*** and the execution of Decedent's job duties in the present case, regardless of the end result.

No matter how extreme the conditions, the fact remains that Decedent was performing the job for which he was trained and employed. By fighting a fire, Decedent was not subjected to an "unexpected event" accompanied by a "manifestation of force," unlike the decedents in ***Kellogg*** and ***Boring***, *supra.*[4] As such, there is no coverage under the AD&D Rider of the insurance policy at issue.

---

[4] The Court also finds the circumstances in ***Rankin v. United Comm. Travelers of America***, also relied upon by Plaintiff (*see* Doc. 347, sealed, at 51-52), to be distinguishable. 193 Kan. 248, 392 P.2d 984 (1964). Although the decedent in ***Rankin*** died after attempting to put out a grass fire, he was a farmer and rancher by trade, not a professionally trained fireman.

## C. Defendant is not Prohibited from Urging as a Defense the Failure of the Primary Coverage Provision.

Plaintiff argues that Defendant is not permitted in this litigation to defend the claim based on an assertion that the lack of an "accidental bodily injury" results in the failure of the primary coverage provision. Plaintiff's argument begins with a claim that Defendant's original stated reasons for coverage denial did not raise this issue. Then, Plaintiff first argues that Defendant is estopped from presenting that defense. Finally, Plaintiff argues that, although this policy is exempt from ERISA, the attachment of a page describing ERISA rights in the delivered policy imported ERISA legal principals in a way that prohibits the assertion of new ground for denial in litigation.

### 1. Defendant communicated its reliance on the failure of the insuring provision a the time of the denial.

Defendant's initial denial letter stated that Decedent's "death was not caused directly and independently of all causes from accidental injury as the insured's underlying heart condition, as well as circumstances surrounding the surgery, contributed to his death and therefore, the applicable exclusions of the policy apply." (Doc. 347-17, sealed, at 2.) The letter continues that "benefits are payable if the loss results directly and independently of all other causes from accidental bodily injuries." (*Id*.) The letter then includes reference to exclusion (5), "bodily

or mental illness or disease of any kind or medical or surgical treatment of the illness or disease." (*Id.*)

Plaintiff argues that Defendant is limited to the reasons enumerated in its initial denial letter – the disease exclusion – otherwise the appeal would not be full and fair. (Doc. 347, sealed, at 37-40.) Defendant is correct, however, that "[t]he requirement of an 'accident' or an 'accidental bodily injury'" is a policy coverage issue, rather than an exclusion. (Doc. 364, sealed, at 100; Doc. 215-11, sealed.) Defendant responds that the letter "clearly referenced the requirement of an 'accident' or 'accidental bodily injury.'" (Doc. 364, sealed, at 103.) The Court agrees with Defendant. There is no other way to interpret this language from the initial denial letter but that Defendant determined Decedent did not die "directly and independently of all other causes from accident bodily injuries." The same language is specifically included in Defendant's denial of Plaintiff's appeal, which states that Decedent's "death did not result directly and independently from accidental bodily injury." (Doc. 347-17, sealed, at 3.) In other words, the death was not caused by an accident, but heart disease – even if that disease manifested itself for the first time during the performance of Decedent's duties. The Court, therefore, determines that Plaintiff should not have been surprised that Defendant would contend in the present litigation that Plaintiff's death was not accidental.

        **2.**      **Even if the Defense was first raised in this litigation, estoppel cannot be applied to create coverage in the policy.**

Further, even assuming *arguendo* that the lack of an accident was raised for the first time after the commencement of litigation, Defendant would not be estopped from raising it. The doctrines of waiver and estoppel may not be used to expand the scope of an insurance policy. *See AKS v. Southgate Trust Co*., 844 F.Supp. 650, 659 (D.Kan. 1994) (so holding in a case in which a defendant failed to assert "each and every potentially applicable exclusion" to the policy in its denial letter); *see also Hennes Erecting Co. v. Nat'l Union Fire Ins. Co*., 813 F.2d 1074, 1080 (10th Cir. 1987) (holding that "[w]hile timely and complete disclosure of the reasons for denying a claim would certainly have been preferable, waiver and estoppel cannot be used in these circumstances to increase the insurer's risk beyond the terms of the policy").

Kansas courts have also found a distinction between estoppel based on a defendant's "mere failure to identify lack of coverage" on one hand versus a defendant who has taken affirmative actions implying coverage on the other. *Continental Cas. Co. v. Multiservice Corp*., No. 06-2256-CM, 2009 WL 1788421, at *3-4 (D.Kan. June 23, 2009). Plaintiff cannot – and does not – argue that Defendant ever did or communicated anything to affirmatively make Plaintiff believe there was coverage for this type of loss. To the contrary, it is undisputed that Defendant consistently indicated it was denying coverage. (*See generally* Doc. 347-17.) Plaintiff was aware that litigation would be necessary

after the appeal was denied, regardless of the stated reason for denial. Plaintiff's argument relating to the litigation costs and fees it has incurred is, therefore, unpersuasive. As such, the doctrine of estoppel would not preclude Defendant from raising lack of an accidental death as a reason to deny coverage even assuming Defendant failed to do so during the claims review and appeal process.

> 3. **ERISA legal principals were not imported into the contract in a manner that would bar the consideration of the Defense of failure of the principal insuring provision.**

Plaintiff argues that the inclusion of the "Statement of ERISA Rights"/"Claims Procedures for Life Insurance Plans" pages (hereinafter "Statement of ERISA Rights") effectively imported ERISA legal procedures and principals into this ERISA-exempt contract. Plaintiff argues that the proper scope of review would be thus limited to the "record" before the "plan administrator" (in this case by analogy to the defendant insurance company) and limited to the rationale expressly relied upon in the denial of coverage. Plaintiff's claim that the previous denials did not rely upon the lack of an "accidental injury" to deny coverage leads plaintiff to conclude that Defendant is precluded under contractually-incorporated ERISA law from changing theories in this case.

Plaintiff argues that, because of documents it contends were not "discovered" until after the initiation of this litigation,[5] the insurance contract at issue is directly controlled by ERISA. In the alternative, Plaintiff argues that because ERISA rights were referenced in the insurance contract, the policy is subject to certain incorporated ERISA rules and procedures even if not directly subject to the Act.[6] Plaintiff's motion also seeks a determination that, because ERISA standards apply, the Court's review of Defendant's coverage denial should be limited to a *de novo* review of the medical coverage issues based only on evidence that was before the insurer at the time of the denial (referred to by Plaintiff as the "administrative record").

### a. the "Statement of ERISA Rights" document

Plaintiff contends that the "Statement of ERISA Rights" document (Doc. 215-13), and thus the ERISA statute and relevant law, is included in the insurance policy at issue. More specifically, Plaintiff contends that Defendant made ERISA appeal rights

---

[5] This is a curious contention because Plaintiff's argument must necessarily include a claim that these "missing" pages were, in fact, delivered to Plaintiff as part of the original policy when it was issued.

[6] It is undisputed that a party cannot "opt in" to ERISA, regardless of the intentions or desires of the parties. (Doc. 364, sealed, at 95; Doc. 390, sealed, at 120.) *See also **Hall v. Me. Mun. Employees Health Trust**,* 93 F.Supp.2d 73, 75 (D. Me. 2000) ("A benefit plan does not choose whether to opt in or opt out of ERISA.")

part of the group policy of insurance in this case. KCL knew when it answered both the Petition and the Amended Complaint that ERISA appeal rights were part of the contract of insurance it had with WFRA. KCL's failure to disclose that the 'Statement of ERISA Rights' was part of the policy was not merely a 'miscommunication.' It was an intentional act.

WFRA is a participant or beneficiary as defined in the plan [29 U.S.C. 1132(a)], and is entitled to federal court review of the denial of benefits, in accordance with the ERISA rights KCL has tried to prevent WFRA from asserting. [See 29 U.S.C. §1132(a)(1)(B)].

The law governing an appeal of an ERISA claim was voluntarily adopted by KCL, although as a government plan, ERISA has no mandatory jurisdiction. [See 29 U.S.C. §1002 (32)].

(Doc. 214, at 34.)

Plaintiff's contention that ERISA is part of the insurance policy at issue finds its factual basis in the following two paragraphs from Plaintiff's second Motion for Summary Judgment (with corresponding exhibits):

99. The "Statement of ERISA Rights" was a part of WFRA's group policy. [Ex. A, O'Connor depo. pp. 55:8-56:3; Ex. Y, Seeman depo. p. 22:15-25].

100. All KCL group policies contain the "Statement of ERISA Rights." [Ex. Z, Seeman Aff., Dkt. 266-2; Ex. AA, Anderson Aff., Dkt. 266-3].

(Doc. 347, at 22.)

The exhibits Plaintiff has cited in support of these paragraphs establish that 1) Matthew O'Connor, Defendant's Assistant General Counsel for Investments, "assumed" the Statement of ERISA Rights was made part of the WFRA group

insurance benefits policy; 2) Jeffrey Seeman, Defendant's Vice President of Group Insurance, stated that he "believed" the standard form policy would include a Statement of ERISA rights because "most" – but not all – group insurance policies are provided by an employer and are covered by ERISA;[7] 3) and, also according to Mr. Seeman, "[a]t the time of the issuance" of the policy at issue, "KCL's normal and customary business practice was to attach the 'Statement of ERISA Rights' to all insurance policies when issued, regardless of whether ERISA is applicable to that specific policy."

In response to Plaintiff's motion, Defendant establishes that Plaintiff was not aware of the "Statement of ERISA Rights" pages until after the litigation had commenced. (Doc. 364-9, at 13.) Further, at no time between 2001 and 2009 did members of the WFRA Board believe that any of the Association's members were entitled to ERISA rights or protections. (Doc. 364, at pg. 88, ¶ 91; Doc. 364-9, at 29.) Also, Plaintiff cannot prove that it ever even received the "Statement of ERISA Rights" during the relevant time period. (Doc. 364, at 89-90; Doc. 364-9, at 52-53.)

Even so, the only affirmative evidence or testimony relating to the "Statement of ERISA Rights" establishes that, at the time in question, Defendant's

---

[7] It is uncontroverted that the policy at issue was statutorily exempt from, and not governed by, ERISA. (*See* Doc. 69, at 2; Doc. 214, at 34; Doc. 266, at 26.)

standard form policy would include a Statement of ERISA rights and its "normal and customary business practice" was to attach the 'Statement of ERISA Rights' to all insurance policies. (Doc. 347, at 22; Doc. 347-27, sealed, at 3.) In the absence of evidence that Defendant acted contrary to its standard practices at the time in question, the Court concludes that the "Statement of ERISA Rights" was sent by Defendant to Plaintiff with the initial policy. Thus, the question before the Court is the legal impact or significance of Defendant's inclusion of these two pages. (Doc. 215-13, sealed.)

### b. the impact of inclusion of "Statement of ERISA Rights"

The parties recognize that a party may not opt-in to coverage under ERISA, regardless of the intentions of the contracting parties. (Doc. 364, sealed, at 95; Doc. 390, sealed, at 120.) *See also* **Hall**, 93 F. Supp. 2d at 75 ("A benefit plan does not choose whether to opt in or opt out of ERISA"). Plaintiff even concedes that "as a government plan, ERISA has no mandatory jurisdiction" over the insurance policy at issue. (Doc. 214, at 34.) Plaintiff argues, however, that Defendant "voluntarily adopted" the entirety of "law governing an appeal of an ERISA claim" as a result of the inclusion of the pages in question. (*Id*.) The Court's analysis must begin with a review of the pages at issue.

The first of these pages is entitled "Statement of ERISA Rights." (Doc. 215-13, sealed, at 1.) The document lists and explains four categories of "rights and

protections" provided by ERISA to plan participants: 1) the right to receive information about the plan and benefits from the plan administrator; 2) the duties imposed on plan fiduciaries; 3) the protection to enforce rights if a claim is denied or ignored, in whole or in part (including the rights know the reason for denial, to obtain copies of relevant documents, and to appeal any denial); and 4) assistance with questions (including the ability to contact the Pension and Welfare Benefits Administration of the U.S. Department of Labor).

Plaintiff concedes that it did not fulfill the duties prescribed to non-exempt entities by this document, such as making available "a copy of the latest annual report (Form 5500 Series) filed by the plan with the U.S. Department of Labor and available at the Public Disclosure Room of the Pension and Welfare Benefit Administration." (See Doc. 390, sealed, at 7; Doc. 215-13, sealed, at 1.) Plaintiff argues, however, that

> the source of WFRA's ERISA rights is the contract, not the federal statute, and the contract does not say that WFRA must submit ERISA reports to, and communicate with the Department of Labor, etc.; KCL did not impose a contractual condition or conditions related to reporting to the government on WFRA; WFRA is not required to do any of the things set out . . . . before it can benefit from the same claim handling process KCL promised all of its insureds, including the ones who are substantively covered by ERISA, and who are NOT exempt. This is a case of an insured trying to enforce a written promise by the insurance company.

(Doc. 390, sealed, at 7.)  In the Court's purview, Plaintiff is attempting to have it both ways by imposing duties from these two pages onto Defendant without itself having to assume any of the responsibilities contained therein.  Even so, the Court will focus its analysis on the rights Plaintiff contends it receives from these pages.

It is doubtful that these two pages, about which Plaintiff was entirely unaware until the current litigation, were ever intended by the parties to be part of the contract or to create additional rights and obligations thereunder.  The Court is further inclined to find that at least the first of the pages is extraneous to the policy at issue because it references rights and protections under ERISA and Plaintiff was aware that the policy at issue was not covered by that statute.  The Court will, however, assume *arguendo*, that the pages became part of the insurance policy as a result of Defendant's "normal and customary business practice . . . attach[ing]" them "to all insurance policies when issued."  Doc. 347-27, sealed, at 3.)

Operating under this assumption, the Court agrees with Plaintiff's statement that "the source of WFRA's ERISA rights is the contract, not the federal statute . . . ."  (Doc. 390, sealed, at 7.)    The Court does not, however, agree with Plaintiff's claim that Defendant has "voluntarily adopted" all "law governing an appeal of an ERISA claim . . . ."  (Doc. 214, at 34.)  As Defendant argues, "even if [the parties] had agreed to be governed by ERISA . . . , a failure of either side to honor that agreement merely gives rise to a state-law claim for breach of contract."  (Doc.

364, sealed, at 94.)  The Court agrees.  Plaintiff has cited no authority requiring this Court to import the full weight of ERISA law to a contract not statutorily covered by ERISA.

Thus, any such ERISA rights or duties that are included in the insurance policy at issue must be limited to, and defined by, the language used in these two pages.  In other words, the "Statement of ERISA Rights" does not import the entirety of the ERISA statute, and law interpreting the statute, into the contract.  It imports only that which is specifically stated in these two pages.

The first page of this exhibit is the only page referencing ERISA.  (Doc. 215-13, sealed, at 1.)  The page simply indicates that plan participants have the right "to appeal any denial . . . within certain time schedules."  The page does not indicate that participants are now bestowed with full ERISA claims procedures or the benefits of an ERISA appeal, despite Plaintiff's argument to the contrary. (*See* Doc. 215-13, at 1; Doc. 214, at 35.)

In addition, this portion of the exhibit states that, under certain conditions, a participant "may seek assistance from the U.S. Department of Labor . . . ."  While such assistance is allowed to participants of plans that fall under ERISA statutorily, Plaintiff does not argue that participants of the plan in question have this ERISA right.  This is another example of Plaintiff attempting to have it both ways by using this document as a basis for the rights that benefit its position while ignoring or

dismissing the rights that participants do not have, the duties that Plaintiff has not executed, and the language of this document that does not advance Plaintiff's argument.

The second page of this exhibit, entitled "Claim Procedures for Life Insurance Plans," sets forth the procedure for appealing a denial of claims, including relevant time frames. This page makes no reference to the ERISA statute or ERISA law whatsoever. (Doc. 215-13, at 2.) There is no reference or citation to the Code of Federal Regulations. Thus, even assuming *arguendo* that these pages are to be considered a part of the relevant insurance policy, the Court cannot find that their contents entitle participants to the benefits and rights of a full-blown ERISA claims or appeal procedure let alone to the full body of "law governing an appeal of an ERISA claim." Additionally, if these two pages were delivered with the policy, as Plaintiff claims, there would have been no reason to read the second page as having anything to do with ERISA.

The second page of the exhibit does, however, without reference to ERISA, state that Plaintiff is entitled to a "full and fair review" on appeal. (*Id*.) The page continues that the plan administrator will provide a "written decision" regarding the appeal which "will include specific reasons for the decision and specific references to the plan provisions on which the decision is based." (*Id*.)

It is undisputed that Defendant denied Decedent's claim and then allowed an appeal within the relevant time frame. It is also undisputed that Defendant provided a written decision regarding the appeal containing its reasons for the denial. Defendant did not deny Plaintiff the opportunity for a "full and fair review" within the plain meaning of that provision by adding a new reason for the denial that was not included in the initial denial letter or written appeal decision.

*Kellogg*, 549 F.3d 818, discussed *supra*, is an ERISA case factually similar to the case at bar which illustrates the legal principal Plaintiff wishes to import. In *Kellogg*, a plan administrator denied a claim because of a contract exclusion, and made only passing reference to the primary coverage provision requiring accidental death. The court recognized that in the review of a decision made by a plan administrator, the review is limited to the "evidence and arguments that appear in the administrative record," and to the "rationale considered by the plan administrator in the administrative record." The court held that because the denial letter in that case could not "reasonably be interpreted as denying AD&D coverage on the basis that [the claimant's death was not the result of] an 'accident'," the trial court was precluded from affirming the denial on that basis. *Id*., at 829.

The principals in *Kellogg* do not apply because the denial in this case was expressly based in part on the failure to satisfy the primary coverage section. (*See* Section III. C. 1., *supra*.) Even if the letter denials in this case were interpreted, as

in *Kellogg*, to rely only on exclusions and not on the lack of an "accidental injury," the principals in Kellogg would be inapplicable because this insurance policy is not subject to ERISA.  The principal limiting the plan administrator to stated rationale in a ERISA challenge does not stand alone, but is part of the general rules of review governing ERISA court challenges which substantially limit the scope of review.  The structure of the administration of ERISA plans includes a Plan Administrator which must act without conflict of interest to make decisions.  Those decisions may be reviewed *de novo* only after a determination of conflict of interest.  *See generally*, ***Firestone Tire & Rubber Co. v. Bruch***, 489 U.S. 101 (1989); ***Fought v. UNM Life Ins. Co.***, 379 F.3d 997 (10th Cir. 2004).  Within this structure, in reviewing a plan administrator's decision, a court is limited to evidence and arguments that appear in the administrative record.  ***Flinders v. Workforce Stabilization Plan of Phillips Petroleum Co.***, 491 F.3d 1180 (10th Cir. 2007)(overruled on other grounds recognized by ***Holcolm v. Unum Life Ins. Co. Of America***, 573 F.3d 1187 (10th Cir. 1187)).  Therefore, in reviewing a decision under ERISA, the Court considers only the rationale articulated by the plan administrator and determines whether that decision was arbitrary and capricious.  ***Flinders***, 491 F.3d at 1190.

The insurance policy in the present case is not a ERISA plan, and lacks the procedural and structural components of a plan.  There is no "plan administrator."

It was applied as an insurance policy claim and denied as such. There is no rationale for importing broad principals of ERISA into a insurance policy that lacks the plan structure requiring those rules, and Plaintiff has provided no legal authority requiring such.

**IT IS THEREFORE ORDERED** that Defendant's Motion for Summary Judgment and memorandum in support (Docs. 341) is **GRANTED**.[8]

IT IS FURTHER ORDERED that Plaintiff's "Motion for Protective Order and a Determination as a Matter of Law . . . that Plaintiff is Entitled to a *de novo* Review of Defendant's Decision to Deny Coverage" (Doc. 204) and Plaintiff's Motion for Summary Judgment (Doc. 342) are **DENIED**.

IT IS FURTHER ORDERED that Plaintiff's "First Motion for an Addition to the Administrative Record" (Doc. 216), Defendant's "Motion in Limine to Exclude Evidence Relating to Settlement Negotiations" (Doc. 318), and Plaintiff's "Motion to Exclude Dr. Arnold Meshkov's Testimony and Report from Evidence" (Doc. 368) are **DENIED** as **moot**.

**IT IS SO ORDERED**.

---

[8] Because the Court has found a lack of coverage under the policy in question, Plaintiff's remaining claim for bad faith fails as a matter of law.

Dated at Wichita, Kansas, on this 14th day of February, 2014.

s/ KENNETH G. GALE
KENNETH G. GALE
United States Magistrate Judge